**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

**THOMAS EDWARD GUY, JR.,**

       **Plaintiff,**

**v.**                       **Case No.: 5:14-cv-16746**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

       **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Irene C. Berger, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 12, 16).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that

1

Plaintiff's motion for judgment on the pleadings, to the extent it requests remand, be **GRANTED;** that the Commissioner's motion for judgment on the pleadings be **DENIED;** that the decision of the Commissioner be **REVERSED;** that this matter be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings, and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

On May 29, 2012, Plaintiff, Thomas Edward Guy, Jr., ("Claimant"), filed an application for DIB, alleging a disability onset date of October 30, 2001, due to "broken feet, hips and legs in 2000 and now constant pain." (Tr. at 141, 156.)  The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 63, 71). Claimant filed a request for an administrative hearing, (Tr. at 78), which was held on September 17, 2013, before the Honorable Jeffrey J. Schueler, Administrative Law Judge ("ALJ"). (Tr. at 21-48). At the hearing, Claimant moved to amend the disability onset date to January 14, 2005. (Tr. at 11, 24). By written decision dated October 18, 2013, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 11-20). The ALJ's decision became the final decision of the Commissioner on April 11, 2014, when the Appeals Council denied Claimant's request for review. (Tr. 1-4).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, (ECF Nos. 8, 9), both parties filed memoranda in support of judgment on the pleadings, (ECF Nos. 12, 16), and Claimant filed a reply brief. (ECF No. 15). Consequently, the matter is fully briefed

and ready for resolution.

## II.     **Claimant's Background**

Claimant was 50 years old at the time of the amended disability onset date, 57 years old when he filed the instant application for benefits, and 58 years old on the date of the ALJ's decision. (Tr. at 11, 141). He has a high school education and communicates in English. (Tr. at 155, 157). Claimant's past relevant occupations include ironworker, working foreman, and welder. (Tr. at 18).

## III.    **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then

the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2006. (Tr. at 13, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity during the period from the amended alleged onset date of January 14, 2005 through date last insured of December 31, 2006. (*Id.,* Finding No. 2). At the second step of the evaluation, the

4

ALJ found that Claimant had the following severe impairments: "fracture of the os calcis on the right foot and fracture of the left ankle joint." (Tr. at 13, Finding No. 3). The ALJ considered Claimant's other alleged impairments of carpal tunnel syndrome and bone chips in the shoulders, but noted that Claimant did not have medical documentation to substantiate the existence of upper extremity impairments prior to date last insured ("DLI"). (*Id.* at 13-14).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 14, Finding No. 4). Accordingly, the ALJ determined Claimant to have:

> [T]he residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b). However, the claimant was unable to perform jobs that require climbing ladders, ropes, or scaffolds, as well as those that require more than occasional balancing, stooping, kneeling, crouching, crawling, or climbing or ramps or stairs. The claimant was unable to perform jobs that require operational control of moving machinery, as well as those that involve concentrated exposure to temperature extremes, vibration, unprotected heights, or hazardous machinery. Additionally, the claimant could have been expected to be absent from work no more than once a month or off task no more than 10% of the workday secondary to pain.

(Tr. at 14-18, Finding No. 5). At the fourth step, the ALJ concluded that Claimant was unable to perform his past relevant work. (Tr. at 18, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to assess his ability to engage in substantial gainful activity. (19-20, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1955 and was defined as an individual closely approaching advanced age on the amended alleged onset date and was also in this age category on the date last insured; (2) he had at least a high school education and could communicate in

5

English; and (3) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules (the "Grids") supported a finding that the Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 19, Finding Nos. 7-9). Taking these factors and Claimant's RFC into account, and relying on the assistance of a vocational expert, the ALJ decided that Claimant was capable of performing jobs that existed in significant numbers in the national economy. (Tr. at 19-20 Finding No. 10). At the unskilled light level, Claimant could work as a laundry folder, merchandise marker, or house cleaner. (Tr. at 20). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act, at any time from January 14, 2005, the amended alleged onset date, through December 31, 2006, the date last insured, and was not entitled to benefits. (Tr. at 20, Finding No. 11).

## IV. <u>Claimant's Challenge to the Commissioner's Decision</u>

Claimant argues that the decision of the Commissioner is not supported by substantial evidence for four reasons. First, Claimant contends that the ALJ erred by finding that Claimant could perform light exertional level work. (ECF No. 12, at 2). According to Claimant, his bilateral foot injuries prevent him from fulfilling the basic standing and walking requirements associated with light level work. Claimant asserts that, at most, he is capable of sedentary work. He points out that under the Grids, Rule 201.14, he is presumed disabled if limited to sedentary work. (*Id.* at 9).

Second, Claimant argues that the ALJ did not give proper weight to the opinions of Dr. Kropac, Claimant's treating orthopedic surgeon, who stated that Claimant was limited to standing less than two hours in an eight-hour work day and was disabled by pain. Claimant posits that Dr. Kropac's opinions should have been

given substantial weight as he was Claimant's treating orthopedic surgeon, had followed him during the relevant time frame and for an extended period of time thereafter, and had confirmed with objective findings that Claimant's foot and ankle impairments were present since July 2000, when Claimant suffered a work-related injury. (*Id.* at 16).

Third, Claimant alleges that the ALJ erred by failing to resolve the question of whether the opinions rendered by Dr. Kropac in 2013 applied to the relevant time frame. In February 2013, Dr. Kropac provided written opinions, stating that Claimant was substantially limited in his ability to stand, and he suffered severe pain in his foot and ankle. The ALJ disregarded these opinions on the basis that they were rendered six years after Claimant's DLI, and the evidence did not substantiate that the opinions pertained to the relevant time frame. Claimant argues that the ALJ should have either fully considered the opinions, or sought clarification of the disability onset date given that (1) Dr. Kropac had treated Claimant continuously for the same foot and ankle injuries since 2005, and (2) the opinions referenced 2001, the year Claimant quit working due to his ankle and foot injuries, which is a date that preceded his DLI. However, rather than contacting Dr. Kropac to clarify whether Claimant suffered from the same limitations in standing prior to the DLI, the ALJ merely concluded that "there was no evidence that [Dr. Kropac's] opinion was intended to apply to the period from January 14, 2005 through December 31, 2006." (ECF No. 12 at 18). Claimant asserts that the ALJ had a duty to resolve any ambiguity by querying Dr. Kropac, or by consulting a medical advisor; particularly, in light of the other evidence of record demonstrating Claimant's ongoing difficulties related to his foot and ankle injuries. (*Id.* at 17). Claimant emphasizes

that his application for SSI benefits, filed a mere ten days after the ALJ's decision of nondisability, was granted, suggesting that the ALJ did not adequately evaluate the evidence. (*Id.* at 17-18).

Finally, Claimant argues that the record contradicts the ALJ's determination that Claimant is not credible regarding the intensity, persistence, and limiting effects of his pain. (*Id.* at 18). Claimant contends that the ALJ's rationale for this conclusion was faulty. The ALJ found Claimant to be less than credible simply because he used non-narcotic pain medications and had gaps in his medical treatment at certain points in time. Claimant argues that all of his treating physicians found him to be credible, noting that his symptoms of pain were entirely consistent with the type of injuries he had sustained. Moreover, Claimant asserts that any gaps in his medical care were due to his belief that no other treatment options were available. Finally, as evidence of his credibility, Claimant points to his prior work history and his efforts to work as a sculptor when he could no longer perform his job duties as an ironworker. (*Id.* at 19-20).

In response, the Commissioner maintains that there is substantial evidence supporting the conclusion that Claimant is able to perform a modified range of light level work. (ECF No. 16 at 11). The Commissioner relies upon gaps in Claimant's medical treatment and his self-employment as an artist as evidence that he was functioning adequately during the relevant time frame. (*Id.* at 12-13). The Commissioner stresses that although Claimant complained of severe pain, his treatment records reflect only routine and conservative care, as well as recommendations for additional care that Claimant failed to follow. (*Id.*at 14).

With respect to Dr. Kropac's opinions provided in a Physical Capacities

8

Questionnaire and Assessment Form prepared by Claimant's counsel, the Commissioner contends that the ALJ properly weighed the opinions given that they were rendered in February 2013, more than six years after Claimant's DLI. (*Id.* at 15). According to the Commissioner, Dr. Kropac's 2005 and 2006 treatment records of Claimant did not support the severity of impairment documented in the 2013 Physical Capacities Questionnaire and Assessment Form. (*Id.* at 16). The Commissioner disagrees that Dr. Kropac tied the 2013 findings to the relevant time frame by referencing Claimant's 2001 cessation of work, noting that Dr. Kropac did not begin treating Claimant until July 2005 and, thus, would not have personal knowledge of Claimant's condition prior to 2005. The Commissioner adds that the reference to the year after Claimant suffered ankle and foot injuries was made by Claimant's counsel, not Dr. Kropac. (*Id.* at 17). The Commissioner further disagrees that the ALJ had an obligation to either contact Dr. Kropac, or retain a medical advisor, to resolve questions regarding the onset date of Claimant's limitations. The Commissioner argues that the ALJ's finding of non-disability negated the need for clarification or additional medical evidence. (*Id.* at 18). The Commissioner rejects Claimant's argument that his SSI award effective November 2013 called into question the validity of the ALJ's decision, asserting that a subsequent favorable award does not necessarily cast a new light on the evidence before the ALJ. The Commissioner points out that the Appeals Council was aware of the SSI award and still concluded that the ALJ's decision was supported by substantial evidence. As Claimant did not submit the SSI application, or its supporting documentation, in this case, a determination as to whether the SSI disability finding touched on Claimant's functional status in December 2006 simply cannot be made. (*Id.*at 19).

9

Finally, in regard to the ALJ's credibility finding, the Commissioner argues that the ALJ considered the evidence and found that it failed to support a claim of disabling pain in 2005 and 2006. Once again, the Commissioner highlights Claimant's gaps in medical care, his conservative treatment, an opinion by a vocational expert finding Claimant capable of light work, and Claimant's activities of daily living, all of which the Commissioner believes support the ALJ's conclusion that Claimant was less than fully credible. (*Id.* at 20-21).

## V.  Relevant Medical History

While the undersigned has reviewed all evidence of record, only the medical information most relevant to the disputed issues is summarized below:

### A.  Treatment Records

On July 11, 2000, Claimant was admitted to Bon Secours Memorial Regional Medical Center after falling from a structure at work. Claimant sustained a left tibial plafond fracture and right calcaneus fracture.[1] (Tr. at 227). Kennedy Daniels, M.D., performed an open reduction and internal fixation of the left tibial plafond fracture with closed treatment of the right calcaneus. (*Id.*). Claimant tolerated the procedures well, with no perioperative complications. At discharge on July 15, 2000, Claimant could bear weight on the right leg with some difficulty; however, he was able to perform activities of daily living. Discharge instructions included weight bearing restrictions, one aspirin daily for prevention of deep venous thrombosis, and Percocet for pain. (*Id.*).

---

[1] A tibial plafond (also called pilon) fracture is a break "affect[ing] the bottom of the shinbone (tibia) at the ankle joint. In most cases, both bones in the lower leg, the tibia and fibula, are broken near the ankle."  A calcaneus fracture is a breaking of the heelbone. *OrthoInfo,* Copyright ©1995-2015 by the American Academy of Orthopaedic Surgeons.

Claimant followed up with Dr. Daniels on July 24, 2000. (Tr. at 232). A left ankle x-ray showed a fracture that was in good position. An x-ray of the right calcaneus showed slight loss of position, although Dr. Daniels was not particularly concerned at that time. Claimant was advised to remain completely non-weight bearing on the left leg. Dr. Daniels advised Claimant he could bear weight on the right leg for transfers, but he was not to do any excessive walking. Claimant was to remain off work for one month then return for follow up. (*Id.*).

Claimant continued to seek treatment with Dr. Daniels from August 2000 to October 2001. On August 21, 2000, Dr. Daniels noted the surgical wound was completely healed. (Tr. at 234). Claimant was able to ambulate on the right side. X-rays of the right calcaneus showed a healing fracture with no further position changes, and x-rays of the left ankle revealed the fracture to remain in good position. Claimant was advised to continue non-weight bearing on the left side for another two weeks. (*Id.*).

Dr. Daniels noted that Claimant was still making progress on September 18, 2000. (Tr. at 235). Claimant demonstrated gentle weight bearing, as well as successful attempts to walk without a protective boot. Claimant complained of soreness in the right heel with some tingling of the forefoot, but had no complaints relating to his left ankle. (*Id.*). Claimant expressed his desire to return to work; however, Dr. Daniels limited Claimant to driving and supervisory duties only. Claimant saw Dr. Daniels again on September 27, 2000 and reported that his attempt to return to work had failed because he was required to do too much walking and to walk on uneven ground, which compromised his ability to safely perform his job. (Tr. at 236). Claimant was advised to remain off work for three

11

weeks and to begin physical therapy. He was instructed to purchase and wear boots that would offer more support. (*Id.*).

On October 18, 2000, Claimant reported to Dr. Daniels that physical therapy was helping. (Tr. at 237). He also stated that switching to better boots had enabled him to walk much better. Claimant indicated that he felt able to return to light work the following day**.**

Claimant returned to Dr. Daniels on November 17, 2000 and advised that he had returned to work full-time, although he still had mild swelling and tingling in the front of both feet. (Tr. at 238). He also complained of foot aches at the end of the day, indicating that he had resumed fairly active work duties that sometimes included climbing ladders. A physical examination revealed that Claimant ambulated with mild guarding, but his gait appeared steady. (*Id.*).

Dr. Daniels next saw Claimant on February 15, 2001. (Tr. at 239). Claimant told Dr. Daniels he was not taking any pain medications. He had no complaints of sleep disruption; however, he continued to work at a slow pace. Claimant complained that he had to sit down frequently and described having pain when he twisted while standing. Claimant's physical examination showed a range of motion of fifteen degrees dorsiflexion to thirty-five degrees plantar flexion of the right ankle. The left ankle revealed five degrees dorsiflexion and thirty degrees plantar flexion. Claimant had good subtalar motion in both feet. X-rays of the right calcaneus reflected a completely healed fracture with some shortening of the calcaneus tuberosity. X-rays of the left ankle also demonstrated complete healing, and while there was no significant loss of joint space, there was some step-off in the joint secondary to the comminution of the fracture. Dr. Daniels opined that

Claimant had reached maximum medical improvement and ordered a functional capacity evaluation. He also believed that Claimant would require future medical treatment. (*Id.*).

On March 16, 2001, Claimant was seen by Eli M. Lippman, M.D., for an orthopedic consultation. (Tr. at 245). Claimant complained of constant left ankle pain with swelling in the foot. He also complained of right foot numbness, tingling, and pain in the heel, with swelling and increased pain after walking. On examination, the left ankle appeared swollen, with loss of bulk and tone of the left calf muscles most noticeable in the gastrocnemius, which were soft with minimal strength. Claimant was limited in both dorsiflexion and plantar flexion. Dr. Lippman also appreciated a bony irregularity in the distal fibula. The right ankle showed thickening and tissue change of the right os calcis. Dorsiflexion in the right foot was ninety degrees; plantar flexion twenty degrees; inversion three degrees; and eversion was zero. (*Id.*). Claimant walked with an abnormal gait and was unable to stand on his toes or heels and balance himself without falling. Dr. Lippman's findings included fracture of the os calcis on the right, severe, with severe residuals; and fracture of the left ankle joint, status postoperative, with severe residuals. Dr. Lippman opined that Claimant was permanently disabled from his occupation as an ironworker. Claimant was told not to climb or to use ladders. Dr. Lippman felt Claimant had an eighty percent impairment of his right lower extremity and an eight-five percent impairment of his left lower extremity. (Tr. at 246).

Claimant returned to Dr. Daniels on March 28, 2001 and reported that he had attempted to perform his job, but had experienced problems climbing ladders, walking on uneven surfaces, standing for prolonged periods of time, and keeping his

balance. (Tr. at 240). Claimant was instructed to stay off-work pending the results of the functional capacity evaluation and vocational rehabilitation. (*Id.*). On April 25, 2001, Claimant reported no change with regard to his activity restrictions. (Tr. at 241). On May 21, 2001, Claimant stated that his pain level was stable and he could stand for up to an hour without having to sit down. (Tr. at 242).

Christine A. Moran, MS, PT, CHT, of West End Therapy Center, tendered a report to Dr. Daniels dated July 19, 2001 detailing her assessment of Claimant's physical capabilities. (Tr. at 194-226). As to functional capacity, Claimant demonstrated abilities that corresponded with specified job demands in the following categories: low lift, carry up to fifty pounds, crawl, stoop, kneel, reach with weight, handling, bi-manual handling, fingering, and bi-manual fingering; however, during all the described tasks, Claimant had trouble maintaining his balance whenever the task required him to rotate his trunk.  Claimant could not meet the job demands in the following categories: high lift, mid lift, full lift, walk, carry up to ten pounds, carry up to twenty pounds, push cart or pull cart at forty pounds, balance, climb stairs, reach immediate or overhead both right and left, feeling, eye-hand-foot, and standing. Ms. Moran reported Claimant could lift in a stationary position up to thirty seven pounds; however, if the task required twisting or forward movement, he would lose his balance. Claimant could carry heavy loads but was unstable in doing so. He could only lift heavy loads if he maintained straight posture. Claimant could walk occasionally, but also could rely on being balanced only occasionally. Claimant could perform occasional or frequent criteria of arm tasks; however, he could not do so constantly as he would become unstable. Claimant complained of swelling and pain in his feet with standing for long periods

14

of time. (Tr. at 194). Ms. Moran recommended that Claimant could perform job duties in a safe and stable position, but not in the more precarious positions he had utilized in the past. (*Id.*).

Claimant returned to Dr. Daniels on October 3, 2001, complaining of a prominent and visible screw in the left ankle over the medial distal leg that Claimant had first noticed one week prior. (Tr. at 243). An x-ray of the ankle revealed that the screw had moved out of place. Dr. Daniels recommended removal of the screw, which was performed on October 12, 2001. (Tr. at 231). On October 22, 2001, Claimant returned for follow-up with Dr. Daniels for the last time. (Tr. at 244). The wound from removal of the screw had healed, and Claimant had no complaints. At this time, he was continuing to participate in vocational rehabilitation. (*Id.*).

The medical records supplied by Claimant reflect no additional medical treatment until 2005. (Tr. at 192). On February 2, 2005, Claimant was examined by Kenneth R. Lippman, M.D. for complaints related to both lower extremities. Claimant reported that in July 2000, he fell at work, breaking his left ankle and crushing his right heel. He was treated initially in Virginia and seen in follow-up by Dr. Kennedy Daniels. He described his injuries as being severe enough to preclude him from further employment as an ironworker. Claimant indicated that he currently was self-employed as an artist doing metal work. (*Id.*). With respect to his symptoms, Claimant stated that he was careful with his feet, but they still tended to swell during the day and after an hour of standing, "they fel[t] like he [was] walking on crushed glass." (*Id.*). Claimant also reported poor balance, noting he could no longer climb ladders or run. An examination of Claimant's right heel revealed full ankle dorsiflexion and plantar flexion. Inversion was limited to five degrees with

15

zero eversion. The left ankle dorsiflexion was to the neutral position with only twenty degrees plantar flexion, five degrees inversion, and zero eversion. Manipulation of the ankle caused pain. In addition, the ankle was tender at the distal extent of the incision with prominence of the underlying hardware. (*Id.*). X-rays of the left tibia and fibula showed evidence of a fracture at the distal tibia as well as a spoon type plate with multiple screws in the plate and an anterior screw out of the plate. There appeared mild diffuse demineralization in this area. (*Id.*). An x-ray of the right calcaneus showed a crush of the heel, and fracture deformity was noted. Dr. Lippman diagnosed right calcaneus fracture and left distal tibia fracture, status post open reduction internal fixation. Dr. Lippman opined that Claimant's impairments would prevent him from returning to his occupation as an ironworker. (Tr. at 193).

Later that year, on July 28, 2005, Claimant began treatment with Robert P. Kropac, M.D., an orthopedic surgeon, for complaints of pain in his right foot and left ankle, and swelling in both ankles and feet. (Tr. at 249-53). Claimant reported that he sustained an injury in 2000 while working, stating that he was on an I-beam approximately twenty-five feet in the air when the column broke. Claimant rode the beam to the ground, landing directly on his feet with his knees in full extension. (Tr. at 249). He required immediate surgery, including an open reduction internal fixation of a left ankle fracture, and his injuries left him temporarily totally disabled for about one year. Claimant subsequently attempted to return to light duty work; however, he quit after two months. Claimant told Dr. Kropac he was currently self-employed as an iron welder. (*Id.*). When asked about his current complaints, Claimant stated that his left ankle pain and swelling was precipitated by standing

and walking. He also felt popping and a grinding sensation in the ankle and experienced stiffness and a limitation in motion. Claimant indicated that pain in his right heel was also triggered by standing and walking, and he had stiffness in the right ankle and foot, although his range of motion was better with the right ankle than with the left one. (Tr. at 250). Dr. Kropac examined Claimant's feet and ankles and found the left ankle to have a limited range of motion, although there was no evidence of ligamentous laxity on stress testing the left ankle motor groups. The right ankle had a better range of motion; however, Claimant experienced pain at the extremes of motion on inversion and eversion. No crepitus or atrophy were noted; deep tendon reflexes, dorsalis pedis pulses, and posterior tibial pulses were 2+ and equal bilaterally; sensation was grossly intact; and motor strength was normal in all major motor groups. Claimant was able to heel and toe walk, but with difficulty on the left side as compared to the right. Claimant's gait was antalgic. He was able to squat with difficulty secondary to limitation of motion with pain in his left ankle. (Tr. at 251). X-rays of the left ankle revealed a healed interarticular fracture with hardware in place. Degenerative changes were apparent in the talotibial joint and over the lateral joint compartment. X-rays of the right foot revealed a healed fracture over the os calcis. (Tr. at 252). Claimant was diagnosed with comminuted interarticular fracture of the left ankle, status post open reduction, internal fixation, that was healed; and healed fracture of the right os calcis, both secondary to Claimant's injury of July 11, 2000. (*Id.*). Dr. Kropac reconfirmed that Claimant had reached maximum medical improvement. Dr. Kropac opined that other than medical maintenance for Claimant's symptoms, no additional treatment was appropriate at the time. He ordered a medication regimen of Orudis 75 mgs for anti-

inflammatory and analgesic effect, along with Ultram 50 mg to be taken as necessary for pain. (*Id.*).

Claimant returned to Dr. Kropac on August 24, 2005, reporting that his pain was essentially unchanged although the use of Orudis helped to some extent. (Tr. at 254). Claimant complained that he did not like taking Ultram because it caused him to feel light-headed. Claimant reiterated that the pain in his feet was aggravated with standing and walking. An examination revealed left heel tenderness, as well as a limited range of motion of the left foot. (*Id.*). Dr. Kropac instructed Claimant to continue with Orudis, to be fitted with orthopedic depth shoes, and to return in two months. (Tr. at 255). Claimant returned to Dr. Kropac on October 24, 2005, reporting that the prescription medication had made his pain more tolerable. However, he had not yet filled his prescription for orthopedic shoes. Claimant still had bilateral ankle tenderness and limitation of motion. (Tr. at 256).

By his January 23, 2006 appointment, Claimant had obtained the orthopedic shoes and advised Dr. Kropac that both the shoes and the medication reduced the pain in his ankles and feet. (Tr. at 258). An examination of Claimant's right heel revealed tenderness. His left ankle was also tender and had a limited range of motion. (*Id.*). Claimant was prescribed Orudis and Ultram and told to return in three months. (Tr. at 259).

Claimant did not return to Dr. Kropac's office until June 5, 2006, at which time he reported increased sensitivity related to a screw that was backing out from the ankle fixation hardware. (Tr. at 260). An examination produced tenderness over the prominence of the distal aspect of the tibia where the fixation screw was protruding. (*Id.*). Dr. Kropac referred Claimant to Dr. Daniels for removal of the

screw. (Tr. at 261). Claimant was instructed to continue taking his medications and to return in three months, or sooner if his symptoms worsened. Claimant returned to Dr. Kropac on August 28, 2006, although he had not yet had the screw removed by Dr. Daniels. His symptoms were essentially the same. (Tr. at 262). Dr. Kropac again referred Claimant to Dr. Daniels to have the protruding screw removed and instructed him to continue taking his medications. (Tr. at 263).

On November 28, 2006, Claimant returned to Dr. Kropac complaining of pain, which was more pronounced with standing and walking, accompanied by increased pain in the knees with popping, grinding, swelling, and generalized stiffness. (Tr. at 264). Claimant described having difficulties walking or standing on his left ankle and right foot and stated that he was now unable to kneel or squat. A physical examination produced tenderness over the prominence of the distal aspect of the tibia, the cause of which was the displaced fixation screw. Examination of the right os calcis revealed no new findings. Claimant continued to have limited range of motion with inversion and eversion. (*Id.*). Dr. Kropac kept Claimant's medication regimen the same and instructed him to return in three months. (Tr. at 265).

Claimant returned for a follow-up examination by Dr. Kropac one time in 2007. (Tr. at 266). On February 27, 2007, Claimant presented and requested a new prescription for orthopedic shoes. (*Id.*). He told Dr. Kropac that his pain symptoms were unchanged from his last evaluation, and the pain was aggravated by standing and walking. He also complained of generalized stiffness and a limited range of motion of both ankles. However, Claimant advised Dr. Kropac that his pain was more tolerable with the use of prescription medications. Once again, a physical examination revealed tenderness over the prominence of the distal aspect of the

19

tibia where the displaced fixation screw continued the process of backing out of the hardware. Examination findings of Claimant's right os calcis were unchanged. (*Id.*). Dr. Kropac requested authorization for Claimant to obtain a new pair of work boots and kept him on the same medication regimen.

The medical records indicate that Claimant did not seek medical treatment again until approximately two and one half years later on July 23, 2009. (Tr. at 268). On this date, Claimant was examined by Dr. Kropac for complaints of persistent left-sided ankle pain and right-sided heel pain. Claimant told Dr. Kropac his treatment consisted of over-the-counter medication. He also reported that he no longer sold iron art work because he had to slow down his activities. Claimant continued to complain that his pain was exacerbated with standing or walking. He also had swelling, popping, grinding, and a limited range of motion of the left ankle. A physical examination revealed tenderness over the distal aspect of the tibia, again related to the moving fixation screw. The right os calcis examination was noted to be unchanged. (*Id.*). Claimant was prescribed Orudis and Ultram, with Lortab added for breakthrough pain. He was provided a prescription for new boots and was instructed to return in three months. (Tr. at 269).

Claimant sought treatment with Dr. Kropac one additional time in 2009 and four times in 2010: January 18, 2010, April 12, 2010, July 14, 2010, and October 7, 2010. (Tr. at 272, 274, 276, 278). Claimant reported no changes in his symptoms and noted the prescribed medications continued to reduce his pain. (*Id.*). At the July 14, 2010 visit, Dr. Kropac felt Claimant required a new pair of prescription boots. (Tr. at 277). He prescribed a size thirteen boot for the right foot and a size twelve boot for the left foot. The difference in shoe size was due to the prior os calcis

fracture. (*Id.*).

During 2011, Claimant returned to Dr. Kropac four times: February 23, 2011, May 18, 2011, August 16, 2011, and November 14, 2011. (Tr. at 280, 282, 284, 286). His symptoms were essentially the same throughout the year. Claimant consistently reported that the prescribed medication helped control his pain. At the May 18 visit, Claimant told Dr. Kropac that the pain medication allowed him to function better and have a social life. (Tr. at 282). At the November 14 visit, Claimant told Dr. Kropac that the use of medications along with shoe inserts supplied him with tolerable pain relief. (Tr. at 286). Aside from continuing the medication regimen and prescription boots with inserts, Dr. Kropac provided no other treatment. (Tr. at 283, 285, 287).

Claimant treated with Dr. Kropac four times in 2012: February 8, 2012, May 8, 2012, July 26, 2012, and October 23, 2012. (Tr. at 288, 290, 292, 310). His symptoms remained the same, and Claimant consistently reported that standing and walking exacerbated his pain and swelling. (*Id.*). Claimant's treatment regimen did not change except at the October 23, 2012 visit, Dr. Kropac added Neurontin 600 mg to the medication regimen to alleviate neuropathic pain. (Tr. at 311).

Claimant returned to Dr. Kropac on January 15, 2013 and reported no change in his complaints except for increased pain to his left ankle and right foot. (Tr. at 308). Claimant told Dr. Kropac that due to the pain, he could no longer work. The pain was exacerbated with standing, walking, or weight bearing. He also experienced limited range of motion of his feet and ankles bilaterally. Claimant's examination was unchanged. Dr. Kropac noted that prescribed medications made Claimant's pain more tolerable. (*Id.*). His diagnoses remained the same, as did his

medication regimen, and no other treatment was deemed necessary. (Tr. at 309).

Claimant last saw Dr. Kropac on July 1, 2013. (Tr. at 304).  Claimant reported no changes to his left ankle or right foot symptoms. Claimant told Dr. Kropac the pain in his ankle and heel worsened with walking or standing, adding that weight bearing made his right heel more painful. He continued to have limitations in the range of motion of his left ankle and foot, as well as his right ankle and foot. Claimant's physical examination revealed baseline findings. He told Dr. Kropac his pain was tolerable with medications, allowing him to do more functionally and socially than he would have been capable of doing without medication. (*Id.*).

### B. Evaluations and Opinions

Carol Drury, Ph.D., NCC, CRC, prepared a vocational rehabilitation report on February 16, 2005. (Tr. at 191). Dr. Drury reviewed Claimant's work history, his medical records, and records pertinent to the regional labor market. She also spoke with Claimant prior to generating her report. (*Id.*). Dr. Drury opined that Claimant's work injuries prevented him from performing the duties of his usual occupation, as well as those required by other jobs in which he had training. However, she noted that Claimant had significant skills, knowledge, and talent and was capable of supporting himself as a self-employed artist or sculptor working with metal, if he was provided with the right kind of marketing assistance. Dr. Drury indicated that Claimant had completed and sold several large metal sculptures and had other placed in art galleries. She recommended that he be provided with the services of a marketing agent, adding that being self-employed would allow Claimant the ability to work at his own pace and arrange his art studio in a way to "mitigate his functional losses." (*Id.*). Dr. Drury found that Claimant could also perform light

employment occupations such as ticket taker, toll booth attendant, assembler, gas attendant, or other jobs that "allowed for limited mobility and limited formal training and/or skill development." (*Id.*).

Caroline Williams, M.D., completed a Physical Residual Functional Capacity Examination on July 5, 2012 at the request of the SSA. (Tr. at 49-52). After reviewing the materials, Dr. Williams reported she was unable to assess the severity of Claimant's allegations due to insufficient evidence. (Tr. at 51).

Another agency consultant, Fulvio Franyutti, M.D., completed a Physical Residual Functional Capacity Examination on October 9, 2012. (Tr. at 54-61). While Dr. Franyutti agreed that the fractures to Claimant's lower extremities were severe, he found Claimant only partially credible when describing the intensity of his symptoms. (Tr. at 58). Dr. Franyutti felt that the medical records did not support Claimant's limitations to the extent they were alleged. In addition, he felt that Claimant's activities of daily living; the alleged location, duration, and frequency of his symptoms and pain; the precipitating and aggravating factors; and Claimant's conservative treatment were all inconsistent with a disabling impairment. (*Id.*). In regard to Claimant's exertional capacity, Dr. Franyutti opined that Claimant could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk six hours in an eight hour work day; sit about six hours in an eight hour work day; and was limited in both lower extremities as to pushing or pulling, including operation of hand and/or foot controls. (*Id.*). With respect to postural limitations, Dr. Franyutti felt Claimant could occasionally climb ramps, stairs, ladders, ropes, scaffolds, balance, stoop, kneel, crouch, and crawl. Claimant had no manipulative, visual, or communicative limitations, but he should avoid

concentrated exposure to heat and cold, vibration, and hazards, including machinery and heights. (Tr. at 59). Dr. Franyutti opined that Claimant was reduced to light work with the stated limitations. (Tr. at 59, 60).

On February 5, 2013, Dr. Kropac completed a Physical Capacities Questionnaire and Assessment Form at the request of Claimant's counsel. (Tr. at 295-99). Dr. Kropac indicated that he had treated Claimant since 2005 for a diagnosis of comminuted interarticular fracture of the left ankle, status post open reduction, internal fixation; and fracture to the right os calcis. His treatment consisted of prescribed medications for pain control including Neurontin, Lortab, Oridus, and Ultram. Dr. Kropac rated Claimant's prognosis as fair. He described his objective clinical findings as including a reduced range of motion, abnormal gait, tenderness, swelling, and muscle atrophy to the left calf. (Tr. at 295). Dr. Kropac believed that Claimant was capable of tolerating a moderate degree of stress, although his impairments would prevent Claimant from working a full eight-hour work day. Dr. Kropac further found that Claimant's pain would frequently interfere with his ability to concentrate and would likely produce "good days" and "bad days," causing Claimant to miss approximately four days of work each month. (Tr. at 296-97). Dr. Kropac opined that Claimant would require a job that permitted him to shift positions at will. He felt Claimant could stand for one half to one hour before he had to sit; he could sit for two hours before he needed to stand and/or stretch; and his ability to stand was limited to less than two hours in one day, although Claimant could sit at a work station for six to eight hours in a work day. (Tr. at 297). Dr. Kropac felt that Claimant could frequently lift or carry up to ten pounds; occasionally lift or carry twenty pounds; and rarely or never lift or carry fifty

pounds. (*Id.*). According to Dr. Kropac, Claimant could occasionally twist, stoop or bend, but could rarely climb stairs and should never climb ladders. Claimant had no limitations with his ability to manipulate his arms or hands, and his pain medications should not interfere with his ability to concentrate. (Tr. at 298). The last pre-typed question on the form stated: "In my opinion, Mr. Guy has had these limitations since 2001 which is the date he stopped working due to his injuries." (Tr. at 299). The form then stated "Explain." After the word "Explain," Dr. Kropac wrote "Pain has become intolerable for continued work activities." (*Id.*).

## VI.   <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a de novo review of the evidence to ascertain whether the claimant is disabled. Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If

substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   <u>Discussion</u>

As Claimant's first three challenges are intertwined, all three will be addressed as one. Claimant contends that the ALJ erred by failing to give substantial weight to the opinions expressed by his treating orthopedist, Dr. Robert Kropac, in a February 2013 Physical Capacities Questionnaire and Assessment Form ("Assessment Form"). The ALJ gave the opinions "little weight" for the express reason that "there is no evidence that Dr. Kropac's opinion pertains to claimant's functional capacity prior to January 1, 2007." (Tr. at 18). As such, the ALJ found the limitations contained in the Assessment Form had minimal relevance to the period at issue (January 14, 2005 through December 31, 2006). (*Id.*). Claimant argues that if the ALJ had correctly weighed the opinions, which included a significant limitation on Claimant's ability to stand, his RFC finding would have allowed, at most, sedentary work. Given Claimant's age, education, and lack of transferrable skills, limiting Claimant to sedentary work would have directed a finding of "disabled" under the Grids.

As more fully explained below, the undersigned agrees with Claimant that the ALJ erred in his treatment of Dr. Kropac's 2013 opinions. Moreover, when considering the severity of Claimant's impairments and their impact on his functional capacity, as outlined by Dr. Kropac, there is a reasonable likelihood that proper consideration of the opinions would have altered the RFC finding and may have changed the ALJ's disability decision.

### *The ALJ Erred by Failing to Clarify Whether Dr. Kropac's RFC Assessment Applied to the Time Period in Question*

In this case, the medical source statement in dispute was prepared by a treating physician approximately six years after Claimant's DLI. The statement, an Assessment Form apparently created by Claimant's attorney and completed by Dr. Kropac in February 2013, clearly addressed issues highly relevant to the ALJ's RFC finding. Indeed, some of the limitations set forth in the medical source statement, if given substantial weight, would significantly decrease the occupational base of light exertional level work and might actually preclude the ALJ's determination that Claimant is capable of performing light level work. Light work is defined as:

> [L]ifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b). The ability to stand and walk required by this exertional level is further clarified in Social Security Ruling ("SSR") 83-10, which provides that light level jobs often require frequent walking and standing—"the primary difference between sedentary and most light jobs." SSR 83-10, 1983 WL 31251, at *5 (S.S.A. 1983). According to SSR 83-10:

> "Frequent" means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time.

*Id.,* at *6.

Dr. Kropac opined that Claimant could stand no more than 1 hour at a time before having to sit, and could tolerate less than two hours of standing in an entire eight-hour work day. Dr. Kropac added that Claimant's pain would frequently interfere with his ability to concentrate or focus; he would require a job that allowed him to shift positions at-will throughout the day; he would likely miss work more than four days per month due to his impairments; and he was unable to work a full eight-hour day. These opinions, without question, are inconsistent with the ALJ's RFC finding. Nonetheless, if Dr. Kropac's statements do not describe Claimant's functional capacity as it existed during the relevant time frame of January 14, 2005 through December 31, 2006, then the ALJ acted appropriately in giving the statement little weight. Unfortunately, the Assessment Form is ambiguous on that point, and the ALJ failed to take any steps to clarify this critical issue. The ALJ's conclusion that Dr. Kropac's opinions can be disregarded because "there is no evidence" that the opinions were intended to apply to the relevant time frame is both inaccurate and legally erroneous.

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") recently reinforced the principle that "medical evaluations made after a claimant's insured status has expired are not automatically barred from consideration and may be relevant to prove a disability arising before the claimant's DLI." *Bird v. Commissioner of Soc. Sec.,* 699 F.3d 337, 340 (4th Cir. 2012) (*citing Wooldridge v. Bowen,* 816 F.2d 157, 160 (4th Cir. 1987)). To demonstrate its point, the Court referred to a prior opinion in which the Commissioner's decision was found lacking when "an SSA examiner improperly failed to give retrospective consideration to

28

evidence created between six and seven years after the claimant's DLI, because the evidence could be 'reflective of a possible earlier and progressive degeneration.'" *Bird,* 699 F.3d at 340-41 (*citing Moore v. Finch,* 418 F.2d 1224, 1226 (4th Cir. 1969)). The Fourth Circuit explained that when the evidence supports a finding that an evaluation prepared after a claimant's DLI discusses impairments that existed prior to the claimant's DLI, the evaluation should be given retrospective consideration if the "evidence [also] permits an inference of linkage with the claimant's pre–DLI condition." *Id.* at 341 (*citing* Moore, 418 F.2d at 1226). "Retrospective consideration of evidence is appropriate when 'the record is not so persuasive as to rule out any linkage' of the final condition of the claimant with his earlier symptoms." *Id.* As such, the ALJ in this case applied the wrong standard in addressing Dr. Kropac's Assessment Form. Rather than determining whether the evidence persuasively ***ruled out*** the possibility of a linkage between the Assessment Form and Claimant's pre-DLI condition, the ALJ looked for proof that Dr. Kropac intended the Assessment Form to reflect Claimant's pre-DLI condition. Had the ALJ properly applied the framework set forth in *Bird,* he would not have been so quick to disregard the Assessment Form; particularly, as the record confirms that the impairments addressed by Dr. Kropac in the Assessment Form existed prior to Claimant's DLI, and Dr. Kropac had been Claimant's primary treating orthopedist for those impairments during the relevant time frame through the date of the administrative hearing.

Unquestionably, the evidence permits inferences that the opinions expressed in the Assessment Form were intended to apply to Claimant's pre-DLI condition. In the form, Dr. Kropac indicated that he had seen Claimant every three months since

29

July 28, 2005 for ongoing care of foot and ankle fractures. (Tr. at 295). His diagnoses were the same throughout the entire treatment period. In addition, Claimant's clinical findings and objective signs, as designated on the form, were not noted to have changed significantly during the treatment relationship. Dr. Kropac verified that Claimant's impairments had lasted or could be expected to last at least twelve months. Finally, Dr. Kropac responded to a statement that presumed Claimant's stated limitations had existed since 2001.[2] (Tr. at 299). As the Commissioner correctly emphasizes, that particular statement was drafted by Claimant's counsel, and counsel inserted the 2001 date; however, Dr. Kropac could have disavowed the statement, or simply refused to "explain" it. Instead, Dr. Kropac wrote an explanation after the statement, indicating that Claimant's pain "has become intolerable for continued work activities." (Tr. at 299). Admittedly, the explanation is ambiguous as to when Claimant's pain reached the level of disabling, and the Assessment Form does not specify when Claimant first experienced the functional limitations set forth in the form.[3] Nevertheless, the evidence does not persuasively rule out any linkage between the opinions in the Assessment Form and Claimant's pre-DLI condition.

---

[2] The last pre-typed statement/question on the form read: "In my opinion, Mr. Guy has had these limitations since 2001 which is the date he stopped working due to his injuries." (Tr. at 299). The form then asked Dr. Kropac to "Explain." After the word "Explain," Dr. Kropac wrote "Pain has become intolerable for continued work activities." (*Id.*).

[3] The Commissioner also argues that Dr. Kropac could not have intended to adopt 2001 as the year of disability onset, because he did not begin treating Claimant until July 2005. In the Commissioner's view, "Dr. Kropac could not credibly opine regarding Plaintiff's condition between 2001 and 2005 since Plaintiff did not present to Dr. Kropac until July 28, 2005." (ECF No. 16 at 17-18). The undersigned finds this argument unpersuasive given that medical experts routinely provide retrospective opinions regarding the prior condition of individuals based upon a review of records, or a history and physical examination, or information gathered through a long-standing treatment relationship. While the weight given to the opinion may vary depending upon the existence of a treatment relationship, the lack of such a relationship does not, by itself, negate the basic validity of the opinion.

Furthermore, other evidence exists in the record that supports an inference that Dr. Kropac intended his opinions to cover his entire treatment period. Most significant are Dr. Kropac's office records, which reflect consistent, unremitting symptoms with arguably minor variations in description and treatment. (Tr. at 249-93, 304-13). On Claimant's first visit, he was complaining of right foot and left ankle pain, and swelling of both feet and ankles. (Tr. at 249). He described pain that increased with standing and walking, which was accompanied by stiffness and limitation of motion. (Tr. at 250). He also mentioned popping and grinding in his left ankle. On examination, Dr. Kropac found abnormalities in the left ankle and right os calcis; tenderness; limited range of motion, with left ankle worse than right; antalgic gait; and a left calf measurement 1/4th inch smaller than the measurement of the right calf. (Tr. at 251). X-rays confirmed a healed comminuted interarticular fracture of the left ankle and a healed fracture of the right os calcis. (Tr. at 252). Dr. Kropac prescribed Orudis and Ultram. One month later, he prescribed orthopedic footwear for Claimant. (Tr. at 255).

Six visits later and still during the pre-DLI period, Claimant presented to Dr. Kropac's office on November 28, 2006 for follow-up of "his chronic left ankle and right foot condition." (Tr. at 264). Claimant reported pain in the feet that was exacerbated by walking and standing, increasing pain in the knees with popping and grinding, swelling, stiffness, and an inability to kneel or squat. (*Id.*). On examination, Dr. Kropac found tenderness and limitation of motion of both feet. His diagnoses were unchanged, and his recommended treatment was continued use of pain medications, Orudis and Ultram. (Tr. at 265).

Six visits later, on July 14, 2010, Claimant present to Dr. Kropac's office for follow-up. Dr. Kropac noted that "there has [sic] been no changes with regard to his chronic left ankle and right foot condition." (Tr. at 276). Claimant reported pain and swelling in his feet and ankles that increased with standing and walking, as well as limitation of motion. On examination, Dr. Kropac found tenderness and confirmed that both feet had limitations of motion. (*Id.*). The diagnoses remained the same. With respect to treatment, Dr. Kropac added Lortab for breakthrough pain. He also renewed Claimant's prescription for orthopedic footwear. (Tr. at 277).

On January 15, 2013, Claimant's last visit before Dr. Kropac completed the Assessment Form, Claimant was continuing to complain of pain in his feet and ankles that worsened with standing and walking, as well as limitation of motion. (Tr. at 308). He advised Dr. Kropac that the pain "possibly" was increasing, and he felt he could no longer work. Claimant's physical examination once again revealed tenderness and limitation of motion. (*Id.*). His diagnoses were unchanged, and the only difference in his medication regimen was the addition of Neurontin to relieve neuropathic pain. (Tr. at 309).

Accordingly, the clinical findings and objective signs documented by Dr. Kropac on the Assessment Form, including reduced range of motion, abnormal gait, tenderness, swelling, and muscle atrophy as demonstrated by dissimilar calf measurements, were present at Claimant's initial visit in July 2005, were still present at his last pre-DLI visit, and remained present in February 2013 when the Assessment Form was completed. Likewise, the diagnoses included on the Assessment Form were present on the initial visit and remained the same throughout the eight years that Dr. Kropac treated Claimant. Claimant's

descriptions of pain, including its nature, location, frequency, precipitating factors, and severity, were also largely the same over the course of the treatment relationship. As Dr. Kropac confirmed in the Assessment Form, Claimant's pain increased with weight-bearing, a point that Claimant made at virtually every visit he had with Dr. Kropac both before and after the DLI. In light of these records, which corroborate that standing and walking triggered or exacerbated Claimant's ankle and foot pain and swelling, it is quite reasonable to conclude that Dr. Kropac's February 2013 assessment of Claimant's functional capacity to stand accurately reflected Claimant's level of impairment in 2005 and 2006.

To the extent that the onset dates of the various limitations noted in the Assessment Form were unclear, the ALJ was obligated to clarify them. *See* SSR 96–8p, 1996 WL 374184, at *7. Title 20 C.F.R. § 404.1512(d) requires an adjudicator to develop the medical history of a disability claimant for the relevant twelve-month period prior to the month the claimant was last insured for disability insurance benefits. When the evidence collected or submitted is inconsistent or insufficient for the adjudicator to make a determination about whether the claimant is disabled, Social Security regulations require the adjudicator—in this case the ALJ—to take steps to resolve the inconsistency or insufficiency. 20 C.F.R. § 404.1520b(c). Evidence is considered insufficient "when it does not contain all the information [the ALJ] need[s] to make [a] determination or decision." *Id.* § 404.1520b(a). Evidence is inconsistent "when it conflicts with other evidence, contains an internal conflict, is ambiguous, or when the medical evidence does not appear to be based on medically acceptable clinical or laboratory diagnostic techniques." *Id.* Prior to March 26, 2012, when the opinion of a treating physician was insufficient or

inadequate, the regulation required the ALJ, as the first step to resolving the discrepancy, to "re-contact" the physician for clarification. *See* 77 FR 10651-01, 2011 WL 7404303 (S.S.A. Feb. 23, 2012). However, the regulation changed in March 2012, allowing an ALJ more flexibility in the manner by which he or she resolved the inadequacy. *Id.* Notwithstanding this modification, the final rule on the amendment to the regulation makes clear that when an insufficiency or inconsistency exists in a treating physician's opinion, the ALJ is still obligated to resolve the issue and is expected to do so by re-contacting the physician "when recontact is the most effective and efficient way to obtain the information needed to resolve [the] inconsistency or insufficiency." *Id.* at *10652.[4]

In the present matter, if Dr. Kropac's opinions apply to the relevant time frame, they are entitled to ***controlling*** weight if they are well-supported by clinical and laboratory diagnostic techniques and are not inconsistent with other substantial

---

[4] Furthermore 20 C.F.R. § 404.1520b(c) provides as follows:

(c) If the evidence is consistent but we have insufficient evidence to determine whether you are disabled, or if after weighing the evidence we determine we cannot reach a conclusion about whether you are disabled, we will determine the best way to resolve the inconsistency or insufficiency. The action(s) we take will depend on the nature of the inconsistency or insufficiency. We will try to resolve the inconsistency or insufficiency by taking any one or more of the actions listed in paragraphs (c)(1) through (c)(4) of this section. We might not take all of the actions listed below. We will consider any additional evidence we receive together with the evidence we already have.

(1) We may recontact your treating physician, psychologist, or other medical source. We may choose not to seek additional evidence or clarification from a medical source if we know from experience that the source either cannot or will not provide the necessary evidence. If we obtain medical evidence over the telephone, we will send the telephone report to the source for review, signature, and return;

(2) We may request additional existing records (see § 404.1512);

(3) We may ask you to undergo a consultative examination at our expense (see §§ 404.1517 through 404.1519t); or

(4) We may ask you or others for more information.

evidence. *Id.* § 404.1527(c)(2). Given the potential impact of the opinions and the ambiguity surrounding the onset dates of the various limitations found by Dr. Kropac, the ALJ erred by not taking steps to resolve those critical issues. When considering Claimant's ongoing treatment relationship with Dr. Kropac, his willingness to complete the Assessment Form, and the nature of the insufficiency or inconsistency in the record, the ALJ should have re-contacted Dr. Kropac and obtained clarification. *See, e.g., Stokes v. Commissioner of Soc. Sec.,* No. 10-CV-0278 (JFB), 2012 WL 1067660, *12 (E.D.N.Y. Mar. 29, 2012) (finding that the ALJ had a duty to re-contact the treating physician for clarification of the onset date of a knee disability when the physician's opinion was unclear, and he was the primary treating physician during the relevant time frame).

The Commissioner argues that remand is inappropriate in this case because Dr. Kropac's 2005 and 2006 treatment records do not substantiate the extent of the limitations set forth in the 2013 Assessment Form. She also contends that the records plainly demonstrate that Claimant experienced significant deterioration of his injured ankle and foot in 2009, after his date last insured, but prior to completion of the Assessment Form. While the Commissioner may be absolutely correct in her interpretation of the medical records, remand is still appropriate for multiple reasons. First, Dr. Kropac's medical source statement is ambiguous as to whether it applies to the relevant time frame, and the ALJ is obligated to resolve such ambiguities in order to reach a fair and accurate disability determination. SSR 96–8p, 1996 WL 374184, at *7. Second, if Dr. Kropac confirms that some or all of the opinions contained in the 2013 Assessment Form apply to the relevant time frame, those pertinent opinions are entitled to controlling weight, unless they are

unsupported or inconsistent with other substantial evidence. The duty to weigh evidence and resolve conflicts rests with the ALJ, not with the Court. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). Thus, this Court is not in a position to determine the validity or weight of the opinions. Third, even assuming that all of the opinions rendered by Dr. Kropac are not pertinent to the 2005-2006 time frame, if only the opinions regarding Claimant's ability to stand and his need to have an at-will stand/sit option are applicable, then the RFC finding is likely inadequate to address all of Claimant's impairments and thus requires reassessment by the ALJ. Finally, if the limitations regarding standing reflect Claimant's pre-DLI condition and result in a finding that Claimant is restricted to sedentary jobs, rather than light level work, the Grids would direct of a finding of disability. 20 C.F.R. Pt. 404, Subpart P, App'x 2 § 201.14. Consequently, there is a reasonable likelihood that resolution of ambiguities in Dr. Kropac's opinions would change the disability determination.

Therefore, the undersigned **FINDS** that the ALJ erred in not clarifying the applicability of Dr. Kropac's 2013 opinions to the relevant time frame, and that error prejudiced Claimant.

### *Claimant's Credibility Should be Reevaluated Taking into Account the Assessment Form*

Claimant also complains that the ALJ erred in assessing his credibility. The Court need not address the merits of that argument, because consideration of the opinions contained in the Assessment Form will necessarily require the ALJ to re-evaluate the propriety of his credibility analysis. In evaluating a claimant's credibility regarding his or her symptoms, the ALJ will consider "all of the relevant

evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources, 20 C.F.R. § 404.1529(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, *id.* § 404.1529(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* § 404.1529(c)(3); *see also Craig v. Chater*, 76 F.3d 585, 595 (4th Cir. 1996); SSA 96-7P, 1996 WL 374186, at *4-5.

Social Security Ruling 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at *7. Conversely, "the individual's statements may be less credible if the level or frequency of treatment is

inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons underlying the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." SSR 96-7p, 1996 WL 374186, at *4.

Given that Dr. Kropac's opinions directly address Claimant's pain level and resulting limitations, they provide important evidence on the issue of Claimant's credibility. The ALJ must assess Claimant's credibility in light of the supporting and conflicting medical evidence. The Assessment Form certainly could cast some of Claimant's statements regarding the intensity, persistence, and severity of his symptoms in a new light.

Therefore, the undersigned **FINDS** that Claimant's credibility should be reassessed on remand when taking into account the relevant opinions from Dr. Kropac's 2013 Assessment Form.

## VIII. <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the United States District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **GRANT** Plaintiff's motion for judgment on the pleadings, to the extent it seeks a remand, (ECF No. 12); **DENY** Defendant's motion for judgment on the pleadings (ECF No. 16); **REVERSE** the final decision of the Commissioner; **REMAND** this matter for further proceedings in keeping with the findings herein; and **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Berger and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** June 29, 2015

Cheryl A. Eifert
United States Magistrate Judge